UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

—————————————————————————————

LINDA BUTLER,

                    Plaintiff,
                                            11-cv-00452
          v.                                (WGY)

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

                    Defendant.

—————————————————————————————


WILLIAM G. YOUNG, United States District Judge[1]


**DECISION and ORDER**


I.   **INTRODUCTION**

     Linda Butler ("Butler") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner

of Social Security (the "Commissioner").  Butler challenges the

decision of the Administrative Law Judge (the "hearing officer")

denying her application for Social Security Disability Insurance

("SSDI") benefits.  Butler requests this Court grant her

application for SSDI benefits or remand this case to the

Commissioner for further proceedings.  Form Compl. Appeal

—————————————

     [1] Of the District of Massachusetts, sitting by designation.
Reassignment Order, ECF No. 14.

1

Decision Comm'r Soc. Sec. ("Compl.") 1, ECF No. 1; Mem. Law Supp. Pl.'s Compl. & Mot. J. Pleadings ("Butler's Mem.") 23, ECF No. 12. The Commissioner requests this Court affirm the hearing officer's decision and grant his motion for judgment on the pleadings. Def.'s Br. Pursuant Gen. Order No. 18 ("Comm'r's Mem.") 1, 23, ECF No. 13.

**A. Procedural Posture**

On January 26, 2007, Butler filed a Title II application for SSDI benefits, alleging disability for a period beginning on March 4, 1991, and ending on December 31, 1996 (the "relevant period"). Admin. R. at 13.[2] On June 10, 2009, the hearing officer granted Butler's request for a continuance so that she could obtain an attorney. Id. at 42-47. Butler, represented by counsel, testified in person at the hearing held on August 19, 2009. Id. at 21-41. On September 18, 2009, the hearing officer issued an unfavorable decision, finding that Butler was not disabled. Id. at 20. On October 23, 2009, Butler filed a timely request for review of the hearing officer's decision, id. at 8-9, and submitted additional evidence on January 11, 2011, and January 19, 2011, id. at 5, 175-78, 255. After considering the record and the new evidence provided, the Appeals Council denied

---

[2] Butler also applied for Supplemental Security Income Benefits ("SSIB"). Admin. R. at 97-101. Butler was found disabled but was denied benefits due to a lack of sufficient evidence. Id. at 48-49.

Butler's request on March 4, 2011.  Id. at 1-3.  On April 21, 2011, Butler filed the present action with this Court to review the decision of the Commissioner.  Compl. 1.

**B.  Factual Background**

Butler was born in 1951.  Admin. R. at 25.  She graduated from high school and has completed a "couple of college courses." Id.  Butler stopped working in March 1991 after she fell and suffered injuries to her back.  Id.  Prior to her injuries, Butler worked as a secretary/bookkeeper for approximately seven years, a dispatcher for about three years, a secretary/stenographer for five years, and a waitress for one year.  Id. at 26, 127.  Butler also bred, raised, and trained up to twelve dogs at a time.  Id. at 27.  She traveled extensively to dog shows, but her back pain eventually reduced her to sitting in the ring giving commands, while her husband performed all the physical work.  Id.  Butler stopped traveling to dog shows sometime around 1994 or 1995, id., and now she only trains one dog at a time, id. at 37; see id. at 141 (stating she can no longer train dogs).  She also stated that she has two dogs as pets.  Id. at 138.  Butler is able to microwave meals, eat, read, watch television, use the computer, tend to the dogs when her husband is not home, and care for herself.  Id. at 36, 138-39. Her husband, however, does the laundry, cleaning, and grocery shopping.  Id. at 35, 138.

## 1.  Physical Impairments

Butler has a history of numerous physical impairments, including lower back and neck pain, fibromyalgia, arthritis, colitis, headaches, and hypoglycemia.  Id. at 126.

### a.  Evidence Through December 31, 1996, Considered by the Hearing Officer

Included in the medical records from March 4, 1991, through December 31, 1996, were three treatment letters from Fred P. Scialabba, M.D. ("Dr. Scialabba"), id. at 184-89, MRI results, id. at 288, and a partial examination report performed by Neal S. Greenstein, M.D. ("Dr. Greenstein"), id. at 252, 305-06.[3]

According to the medical evidence, Butler suffered from severe pain in her lower back and right hip after falling on ice in February 1991.  Id. at 187, 252.  On May 14, 1991, Dr. Scialabba reported that Butler consistently described pain in her lower back, which radiated down her right leg.  Id. at 184; see also id. at 186.  Butler's MRI and CT scan revealed that she has a mildly bulging disc and foraminal stenosis at level L4-L5 but discounted a herniated disc.  Id. at 184, 187, 288.  Dr. Scialabba opined that the foraminal stenosis may be the cause of the compression of the L5 nerve but noted that Butler's

_____

[3] Dr. Scialabba's treatment letters are addressed to John R. Cetner, M.D. ("Dr. Cetner"), Butler's treating physician.  Admin. R. at 184-88.  Notably, the hearing officer did not have contemporary records from Dr. Cetner when making his decision. Other medical records from the relevant period available to the hearing officer also mentioned Dr. Cetner.  See id. at 252.

4

description of her symptoms was more consistent with an S1 nerve root irritation.  Id. at 184.  Dr. Scialabba discontinued physical therapy because it did not seem to improve Butler's symptoms; rather, the twenty-minute car ride home seemed to aggravate her pain.  Id.

On February, 7, 1996, Dr. Greenstein reported that Butler had "some diffuse painful tender points consistent with fibromyalgia."  Id. at 306.[4]  According to Dr. Greenstein, after the accident, Butler developed pain in her lower back, making it difficult for her to move.  Id.  She also subsequently developed pain in her upper back, shoulders, neck, right arm and hand, and occasionally her right knee.  Id.  She also suffered from constant headaches and fatigue and had difficulty sleeping.  Id. Prolonged sitting caused some numbness in her right foot and thigh.  Id.  Dr. Greenstein reported that Butler's treatment consisted of medication, including Motrin and Hydrocodone, and physical therapy, which did not seem to improve her symptoms.

---

[4] The February 7, 1996, letter provided to the hearing officer was a truncated copy, which prevented the hearing officer from reviewing the conclusion of the report.  Compare id. at 252, with id. at 305-06 (submitting a complete copy to the Appeals Council).  Among the missing facts in the truncated copy are Dr. Greenstein's observations of Butler's multiple tender points due to fibromyalgia, including lower back and anterior chest wall tenderness, and Butler's back flexion limitation up to sixty degrees due to pain caused by lumbar lordosis.  Id. at 306.  Dr. Greenstein concluded that Butler met the criteria for fibromyalgia from an objective and subjective standpoint.  Id.

<u>Id.</u>  Butler also described suffering from colitis since 1975.[5]
<u>Id.</u> at 37.

### b.  Evidence After Relevant Period Considered by the Hearing Officer

On January 14, 1997, fourteen days after the end of the
relevant period, chiropractor Brad Elliott, D.C. ("Dr. Elliott")
diagnosed Butler with a multi-level lumbar disc injury and
moderate to severe secondary fibromyalgia syndrome.  <u>Id.</u> at 253.
Dr. Elliott's diagnosis was based on Butler's MRI, which showed
lateral recess stenosis, and his own assessments during over one
and a half years of treatment.  <u>Id.</u>  Dr. Elliott opined that
Butler was able to stand for six hours, sit for two hours, and
lift up to fifteen pounds, but required total rest the next day.
<u>Id.</u>

Dr. Elliott reported that Butler's fibromyalgia consists of
multiple tender points, general muscle weakness, stiffness, and
fatigue, accompanied by severe sleep disturbances.  <u>Id.</u>  Butler's
symptoms also include widespread muscular pain, headaches,
irritable bowels, and radicular pain or numbness.  <u>Id.</u> at 253-54.
Dr. Elliott noted that, under the American College of
Rheumatology's diagnostic criteria, fibromyalgia is a diagnosis
of elimination.  <u>Id.</u> at 254.  In August 2009, Dr. Elliott opined
that Butler had been totally disabled since he started treating

---

[5] Butler has also reported to other physicians that her
colitis was diagnosed in the 1970s.  <u>Id.</u> at 191.

her in April 1995. Id. at 249. He reiterated that Butler could not lift more than fifteen pounds, stand, sit, or walk for up to one hour at a time in an eight-hour work day and up to a total of two hours in an entire day. Id. at 250-51.

In March 2000, a CT scan performed of Butler's back confirmed earlier observations from the relevant period that she had a degenerative spur formation and lumbar lordosis at the L4-L5 level. Id. at 199. John R. Cetner, M.D. ("Dr. Cetner"), Butler's treating physician since 1988, examined her in February 2005 and observed a mild degenerative spurring of her back in the lumbar area. Id. at 196. In May 2007, Dr. Cetner diagnosed Butler with lower back pain, fibromyalgia, headaches, and irritable bowel syndrome; Dr. Cetner opined that the diagnosis was permanent in nature and not likely to change. Id. at 207-08. Dr. Cetner confirmed that the back pain was diagnosed "decades" ago and that the fibromyalgia was diagnosed in 1996. Id. at 208. Dr. Cetner noted that despite Butler's subjective complaints of back pain and fatigue, there are "no objective findings of disability." Id. at 211. In Dr. Cetner's opinion, Butler had no limitations regarding her capacity to lift, carry, sit, stand, and walk. Id. at 211-12.

### c. Consultative Examination

On August 6, 2007, consultative orthopedic physician Amelita Balagtas, M.D. ("Dr. Balagtas") examined Butler. Id. at 220-22;

Comm'r's Mem. 3.  Dr. Balagtas diagnosed Butler with fibromyalgia and osteoarthritis of the spine, shoulder, and hands.  Admin. R. at 221-22.  Dr. Balagtas reported that Butler had full flexion, extension, and rotary movements of the spine.  Id. at 221.  Dr. Balagtas also observed tenderness in the posterior paracervical muscles, suboccipital area, upper forearms, and at the anterior chest walls.  Id.  Her lumbar spine forward flexion was limited to thirty degrees and lateral flexion to twenty degrees in both directions.  Id.  The tender points in Butler's lumbar spine were localized in her lumbar paraspinals and gluteal muscles.  Id. Dr. Balagtas opined that Butler had moderate limitations in activities that required bending, lifting, carrying, and prolonged standing and sitting.  Id. at 222.

Disability examiner, W. Denny, saw Butler on September 10, 2007, for a functional capacity assessment.  Id. at 224-29.  The examiner observed that Butler suffered from diffuse pain throughout her whole body, lower back pain, fatigue, insomnia, headaches, and tenderness in local points, including the suboccipital area, forearms, lumbar paraspinals, gluteal muscles, and anterior chest wall.  Id. at 225-26.  These symptoms were caused in part by a mildly bulging disc and foraminal stenosis in her lumbar area; the symptoms were exacerbated by her fibromyalgia.  Id. at 225.  The examiner noted that Butler had the capacity occasionally to lift fifty pounds, frequently to

lift twenty-five pounds, to alternate standing and walking for
six hours in an eight-hour workday, and to sit for six hours in
an eight-hour workday.  Id. at 225.

### d.    Evidence Submitted to the Appeals Council

On January 19, 2011, Butler submitted new evidence to the
Appeals Council.  Id. at 255-308.[6]  Among the evidence submitted

---

[6] On December 2, 2010, the Appeals Council gave Butler
twenty-five days to submit new evidence.  Id. at 6-7.  Yet the
Appeals Council accepted more evidence beyond that deadline and
admitted into the record the evidence received from Butler's
counsel on January 11, 2011, consisting of a four-page brief.
Id. at 4-5; see id. at 175-78.  Apparently, the Appeals Council
did not consider the new evidence contained in the Administrative
Record at pages 255 through 308 when issuing its order on March
4, 2011.  See id. at 4-5.  The date of submission of this
evidence is also unclear.  Comm'r's Mem. 10 n.5.  While Butler's
letter is dated January 19, 2010, and references a memorandum
submitted on January 11, 2010, Admin. R. at 255, the records
enclosed bear a facsimile date stamp of January 11, 2011.  Id. at
256-308.  The Commissioner indicates that this record was
actually submitted on January 19, 2011, Comm'r's Mem. 10 n.5,
although Butler alleges that she submitted the evidence on
January 19, 2010, after she "recently-retained" her attorney,
Butler's Mem. 6.  But see Admin. R. at 86-88 (showing that
Butler's counsel, Stephen J. Mastaitis, was retained on July 15,
2009, thus he could not be "recently-retained" on January 19,
2010).  The origin of the mistake seems to be Butler's counsel's
sloppiness in checking the dates; similar mistakes are found
elsewhere.  Compare Butler's Mem. 9 (stating that Dr. Elliott
sent a letter to the Appeals Council dated January 14, 1987),
with Admin. R. at 253 (showing that the actual date of Dr.
Elliott's letter was January 14, 1997).

The mere submission on January 19, 2011, however, does not
indicate that the Appeals Council considered it.  This lack of
clarity in the record leaves the Court with no guidance as to
whether the new evidence, Admin. R. at 255-308, is even part of
the record.  See 20 C.F.R. §§ 416.1470(b), 404.970(b),
404.900(b); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) ("When
the Appeals Council denies review after considering new evidence,
we simply review the entire administrative record, which includes
the new evidence, and determine, as in every case, whether there

were notes from Dr. Cetner from the period of November 18, 1988,
through May 22, 2007. Id. at 256-76. The new evidence also
included reports from Dr. Cetner, dated April through August
1991, to Butler's insurance company, stating that Butler has been
disabled since March 1991 due to chronic lower back pain. Id. at
268-71. Although Dr. Cetner reported that Butler's chronic back
pain "followed a fall back in January of 1991," id. at 256, his
medical records show that Butler's complaints of lower back pain
seem to have preceded her fall in 1991, see id. at 268
(recommending to take Motrin for discomfort at L4-L5 level in
December 1988 and reporting lower back pain in February 1989).
Nonetheless, Dr. Cetner's handwritten notes consistently describe
Butler's pain in her lower back at the L4-L5 level and her
limited movement during the relevant period. See, e.g., id. at
264 (reporting in March 1991 that Butler experienced pain in her
lower back which gets "worst at sitting"); id. at 263 (reporting
in March 1992 that Butler could not stand or sit for more than
ten to fifteen minutes, demonstrated frontal flexion of thirty
degrees, and exhibited lateral bending of twenty degrees, with
pain in lower back); id. (noting in November 1992 that Butler was

_____

is substantial evidence to support the decision of the [hearing
officer]." (emphasis added)). This Court will assume that the
new evidence is part of the record because it was submitted
before the Appeals Council's order of March 4, 2011, and it was
submitted only a week after the Appeals Council had accepted
other submissions of new information as part of the record.

"unable to sit for a length of time"); id. at 262 (reporting in January 1993 chronic lumbar strain and pain in the lower back with limited frontal flexion to forty-five degrees and thirty degrees of lateral bending); id. at 261 (reporting lower back pain in June 1994); id. at 261-62 (describing in March 1995 that Butler's lateral bending limited to twenty degrees and frontal flexion of twenty degrees due to pain at bending); id. at 260 (treating pain at L-5 level in October 1996).

A CT scan from Butler's lumbar spine taken on March 5, 1991, showed a mild to moderate bulge that caused an encroachment upon the right neural foramen. Id. at 289. This finding is consistent with a mild stenosis, which may cause back pain at the L4-L5 level. Id. at 289-90. A treatment letter from Paul E. Spurgas, M.D. ("Dr. Spurgas"), dated July 2, 1991, noted that Butler reported she could not stand, walk, or sit for more than ten minutes due to the pain and that this pain caused her to stop working. Id. at 291. Dr. Spurgas also noted that Butler's pain is not alleviated with therapy. Id. Dr. Spurgas confirmed that Butler had a mild bulge with an encroachment upon the right neural foramen, but he observed no evidence of a herniated disc. Id.

The new evidence also included a letter from William Byrt, M.D. ("Dr. Byrt"), who examined Butler on March 19, 1992. Id. at

11

296-97.[7]  Dr. Byrt reported that Butler had a mild bulge at the
L4-L5 level, possibly narrowing the right nerve foramen, which
caused her "continuing severe pain, disabling her from most
activities."  Id. at 296.  Dr. Byrt documented her complaint that
she could not stand for long because the pain started to radiate
from her lower back across the buttocks and into her foot.  Id.
From the physical examination, Dr. Byrt observed mild tenderness
in Butler's back at the L4-L5 level, with limited forward
flexion.  Id.  Dr. Byrt noted that there are some discrepancies
between Butler's complaints -- which more likely demonstrate a
dermatome at the S1 level -- and the MRI findings, which indicate
an L5 dermatome.  Id.

     The new evidence also included treatment letters from David
G. Welch, M.D. ("Dr. Welch").  Id. at 293-95.  On December 22,
1992, Butler attended a consultation with Dr. Welch, who observed
that her back pain had been relatively consistent over the past
one and a half years without significant relief.  Id. at 294-95.
Butler reported that her daily activities were significantly
limited due to her pain.  Id.  She was not able to stand or walk
for more than ten minutes and consequently has to depend on
others to drive, shop, and carry things.  Id.  Butler no longer
does the household cleaning and laundry.  Id.  Dr. Welch taught

_____

     [7] The letters appearing in the Administrative Record at
pages 296 and 297 are identical except for the notations made on
them.  Id.

her movement patterns to avoid twisting movements and noted that her ability to work would depend on how she could cope with the pain. Id. at 295. At a follow-up consultation on February 2, 1993, Dr. Welch observed that the medications did not relieve Butler's back pain and that she still had a lot of pain bending forwards, walked stiffly, and moved slowly. Id. at 293.

Butler also submitted an examination report made by Dr. Elliott on November 18, 1995. Id. at 298-300. Dr. Elliott diagnosed Butler with chronic lower back pain and reported that she had been in physical therapy since September 1994. Id. at 298-99. Dr. Elliott noted that although Butler did not return to her work due to the pain, she continued doing limited work at home, which included breeding and training dogs. Id. at 298. Upon examination, Dr. Elliott reported that Butler had a range of motion of forty-five degrees of flexion, twenty degrees of extension, thirty degrees of bending laterally, and forty-five degrees of trunk rotation. Id. at 299. Dr. Elliott reported that she has tenderness at several locations, including the L4-L5 level and in the gluteal muscles. Id. In conclusion, Dr. Elliott stated that Butler has attained her maximum level of improvement. Id. at 300. He characterized Butler as "moderately to markedly disabled" and noted that she suffered from a fifteen percent "whole person impairment." Id.

The record also reflects Butler's examinations by Dr.

Greenstein between February and August 1996.  Id. at 303-06.[8]  Dr. Greenstein concluded that Butler met the criteria for fibromyalgia from an objective and subjective standpoint.  Id. at 306.

Butler was also seen by Ellen F. Cosgrove, M.D. ("Dr. Cosgrove") on May 17, 2000.  Id. at 307-08.  Dr. Cosgrove reported that Butler exercised by walking twenty to thirty minutes three times per week.  Id. at 307.  Butler showed twelve to eighteen tender and painful points due to her fibromyalgia, id., neck pain secondary to cervical spondylosis, lower back pain secondary to lumbar spondylosis, and right shoulder pain due to arthritic changes, id. at 308.

### 2. Testimony

Butler, assisted by her attorney, testified at a hearing held on August 19, 2009.  Id. at 21-47.  During the hearing, she summarily stated that she completed high school and a "couple of college courses," that she was previously employed as a secretary/bookkeeper, dispatcher, secretary/stenographer, and waitress, and that she stopped working in March 1991 after a fall that caused injuries to her back.  Id. at 25-26.  The hearing officer's questioning of Butler was limited to a total of fourteen questions, after which Butler's attorney performed the

_____

[8] A truncated copy of Dr. Greenstein's February 7, 1996, letter was also submitted to the hearing officer.  See id. at 252.

14

examination.  Id.  None of the hearing officer's questions referred to Butler's impairments.  Id.  For instance, when Butler started to describe her back injuries, the hearing officer interrupted her, saying "[o]kay, I just wanted to know why you stopped [working]."  Id. at 25.

During her attorney's examination, Butler described that she used to breed, raise, and train up to twelve dogs at a time, mostly German Shepherds, and that she traveled extensively to dog shows but had to stop due to her back pain.  Id. at 27.  Butler testified that her back pain eventually reduced her involvement to sitting in the ring and giving commands, while her husband performed all the physical work.  Id.  Butler stopped traveling to dog shows sometime around 1994 or 1995.  Id.  She now only trains one dog at a time, and her work does not involve any physical activity.  Id. at 37.

Butler also described that her lower back and right hip pain does not allow her to sit for long; she constantly has to change positions by either standing or lying down.  Id. at 28-29.  She testified that she can continuously sit for fifteen to twenty minutes and walk for no more than five to ten minutes.  Id. at 34.  Her husband does the laundry, cleaning, and grocery shopping.  Id. at 35; see id. at 163 (declaring that Butler cannot do grocery shopping).  But see id. at 141 (noting that Butler shops for groceries and personal care items once every two

weeks).  Butler cooks, watches television, and reads.  Id. at 36.
She also testified that she uses the computer for about one hour
to one and a half hours per day in fifteen- to twenty-minute
intervals.  Id.

Butler also reported that she was treated for her back and
hip problems by several medical professionals, including Dr.
Scialabba,[9] orthopedist Dr. Samuel Caldwell, Dr. Cetner, and Dr.
Elliott.  Id. at 29.  Butler testified that her medical
examinations included physical examinations, MRIs, x-rays, and CT
scans, and that Dr. Scialabba considered the possibility of
surgery.  Id. at 29-30.  Butler stated that she saw her primary
physician, Dr. Cetner, from 1988 until his retirement in May
2009, id. at 33, and saw Dr. Elliott once a week from 1995 until
2005, id. at 33-34.  Butler had to stop seeing Dr. Elliott
because she could no longer afford to pay for his services.  Id.
at 34.  Presently, she only visits Dr. Elliott when "it's [a]
dire necessity because [she] just can't afford the copay."  Id.

Butler also stated that Dr. Greenstein[10] and Dr. Cosgrove
diagnosed her with fibromyalgia.  Id. at 30-31.  Finally, Butler
discussed that she has had colitis since 1975 and is

_____

[9] The transcript actually reads "Dr. Shaliva," spelled
phonetically.  Id. at 29.  This Court presumes that Butler was in
fact referring to Dr. Scialabba.

[10] The transcript actually reads "Dr. Greenspan," spelled
phonetically.  Id. at 30.

hypoglycemic, which requires that she eat properly to avoid shakiness, dizziness, and fainting. <u>Id.</u> at 37-38.

During the hearing, Butler's attorney reported that they were having difficulties locating the records from Dr. Cetner and asked for an extension of time. <u>Id.</u> at 39-40. The hearing officer granted Butler's attorney's request. <u>Id.</u>

## II.  LEGAL STANDARD

### A.    Standard of Review

Federal district courts have the power to affirm, modify, or reverse a decision of the hearing officer. 42 U.S.C. § 405(g). In general, the factual findings of the hearing officer "are conclusive unless they are not supported by substantial evidence." <u>Diaz</u> v. <u>Shalala</u>, 59 F.3d 307, 312 (2d Cir. 1995) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pratts</u> v. <u>Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (quoting <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

Legal decisions are reviewed de novo, and "[w]here there is reasonable doubt as to whether the [hearing officer] applied the proper legal standards," even if the ultimate decision may be "arguably supported by substantial evidence," the hearing officer's decision may not be affirmed. <u>Whipple</u> v. <u>Astrue</u>, No.

17

5:08-CV-1356 (GTS/DEP), 2011 WL 1299352, at *5 (N.D.N.Y. Mar. 8, 2011) (Peebles, M.J.) (citing Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.)). The Court may not "affirm an administrative action on grounds different from those considered by the agency." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)) (internal quotation marks omitted).

B. **Social Security Disability Standard**

A claimant is disabled for the purposes of SSDI benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011).

The Social Security Administration has promulgated a five-step sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v). The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. part 404, subpart P, appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional

18

capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. Id.; see Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden on the last step. Burgess, 537 F.3d at 128. The steps ought be followed in order. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## III.  THE HEARING OFFICER'S DECISION

The hearing officer first determined that Butler last met the insured status under the Social Security Act on December 31, 1996, and that she had not engaged in substantial gainful activity from March 4, 1991, through her last date insured on December 31, 1996. Admin. R. at 15.

Next, the hearing officer found that Butler's back and hip problems and fibromyalgia were severe impairments. Id. The hearing officer noted, however, that at most, Butler had a mildly bulging disc and some foraminal stenosis at the L4-L5 level. Id. The hearing officer supported this finding with the diagnosis performed at the time, which did not reveal evidence of a herniated disc, and Dr. Scialabba's opinion that surgical intervention was not necessary at the time. Id. The hearing officer did not make a determination whether the combination of

Butler's severe impairments interfered with her capacities for lifting, carrying, standing, and walking. See id. Moreover, the hearing officer determined that Butler's arthritis, colitis, headaches, and hypoglycemia could not be established because the record was void of medical evidence and laboratory findings to support the alleged symptoms. Id. at 15-16.

As to the third step, the hearing officer found that Butler did not have an impairment that met or medically equaled the impairments listed by the regulations. Id. at 16.

As to the fourth step, the hearing officer assessed Butler's residual functional capacity, finding that she could perform a full range of medium work as defined under the regulations. Id. The hearing officer reached this conclusion based on the limited evidence provided, which was due, in part, to the failure of some of her treating sources to provide medical records. Id. at 17. The hearing officer noted that despite various attempts to reach out to the sources, the records were not available. See id. at 205 (returning request for Butler's records with a note "[n]ot a patient here" from Dr. Cosgrove at Saratoga Rheumatology); id. at 217 (responding that Dr. Elliott does not keep records for more that eight years, thus there would not be records before January 1, 1997); id. at 219 (responding that there are no records of Butler from 1991 to 1996 at Saratoga Hospital). Further, despite being given additional time, Butler's attorney also encountered

difficulties in finding records from Dr. Cetner due to the physician's recent retirement. See id. at 248.

The hearing officer also determined that although Butler had a mildly bulging disc and some foraminal stenosis at the L4-L5 level, the scant record failed to show any neurological deficit or motor weakness, and the treatment of her symptoms was conservative. Id. at 17. The hearing officer supported this finding with the diagnostic tests performed at the time and Dr. Scialabba's opinion that considered surgical intervention unnecessary. Id.

The hearing officer then determined that Butler had been diagnosed with fibromyalgia at some point after 1991 and noted that Dr. Elliot's January 14, 1997, letter described symptoms consistent with this illness. Id. The hearing officer, however, found that Dr. Elliott's opinion was not supported by medical examinations that would allow him to determine whether the symptoms were of the intensity, duration, and frequency to preclude Butler from performing her work. Id. (noting that "due to the lack of medical evidence . . . it is hard to pinpoint the exact diagnosis or to even evaluate how this condition impacted on her ability to . . . work").

The hearing officer found that Butler was not precluded from work because she continued breeding and training dogs until 1994. Id. (noting that the Dictionary of Occupational Titles describes

this job as requiring an individual to carry, push, and pull twenty to fifty pounds occasionally and ten to twenty-five pounds frequently).  Butler's work with dogs supported his conclusion that Butler retained the ability to engage in activities despite her impairments.[11]  Id. at 17-18.

The hearing officer also gave little weight to Dr. Elliott's opinion as to Butler's capacity to sit, stand, and walk because he was not an acceptable medical source and his opinion was not supported by objective evidence.  Id. at 18.  On the contrary, "careful consideration" was given to Dr. Cetner's 2007 opinion which stated that Butler was not limited in her capacity to sit, stand, and walk.[12]  Id.

The hearing officer also gave limited weight to the consultative examiners' opinions because they are not acceptable medical sources; however, he did note that they found that Butler could perform medium work.  Id.

As to the fifth step, the hearing officer concluded that Butler had the residual functional capacity to perform the exertional demands of her past relevant work as a bookkeeper,

---

[11]  The hearing officer failed to weigh this evidence with respect to Butler's contrary testimony where she stated that her work with dogs does not involve any physical activity; her husband does all the physical work.  Id. at 27, 35, 37.

[12] The hearing officer erroneously indicated that Dr. Cetner first saw Butler in 1998, when his report shows that the initial treatment began ten years before in November 1988.  Compare id., with id. at 207-13.

secretary, stenographer, and waitress.  Id. at 18-19.
Accordingly, the hearing officer found that Butler was not
disabled from March 4, 1991, to December 31, 1996.  Id. at 20.

## IV.  ANALYSIS

### A.  Contentions

Butler contends that the hearing officer failed to develop
the record by not obtaining medical records from all of her
treatment providers and failed to give credit to her testimony
and to the opinion of Dr. Elliott.  Butler's Mem. 1-2.

The Commissioner argues that the record was properly
developed.  Comm'r's Mem. 7.  Specifically, the Commissioner
alleges that the hearing officer did not have an additional
obligation to obtain the records because past experience
indicated that the sources could not provide the records, id. at
7-8, the evidence before the hearing officer was sufficient to
make a determination, id. at 8, the hearing officer properly
weighed Dr. Elliott's opinion, id. at 11-15, and the new evidence
submitted to the Appeals Council was not material, id. at 18-22.

### B.  Duty to Develop the Record

The hearing officer has an affirmative duty to develop the
record.  Moran v. Astrue, 569 F.3d 108, 112 (2nd Cir. 2009)
("[I]t is the well-established rule in our circuit that the
social security [hearing officer] . . . must on behalf of all
claimants . . . affirmatively develop the record . . . ."

(quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d
Cir. 2009)) (internal quotation mark omitted)). This duty exists
"[e]ven when a claimant is represented by counsel," id., due to
the "non-adversarial nature of a benefits proceeding," id.
(quoting Lamay, 562 F.3d at 509). The duty to develop the record
extends to the Appeals Council. Sims v. Apfel, 530 U.S. 103, 111
(2000) ("It is the [hearing officer's] duty to investigate the
facts and develop the arguments both for and against granting
benefits . . . and the [Appeals] Council's review is similarly
broad."). The hearing officer "cannot reject a treating
physician's diagnosis without first attempting to fill any clear
gaps in the administrative record." Rosa v. Callahan, 168 F.3d
72, 79 (2d Cir. 1999); see Clark v. Comm'r of Soc. Sec., 143 F.3d
115, 118 (2d Cir. 1998) (recognizing that a treating physician's
"failure to include [proper] support for the findings in his
report does not mean that such support does not exist; he might
not have provided this information in the report because he did
not know that the [hearing officer] would consider it critical to
the disposition of the case"); Ubiles v. Astrue, No.
11-CV-6340T(MAT), 2012 WL 2572772, at *10 (W.D.N.Y. July 2, 2012)
("The failure to develop the record cannot be harmless error
[where the hearing officer] relied on perceived gaps in the
medical evidence to find [the claimant] not disabled.").

    In order to fulfill its duty, the hearing officer "shall

make every reasonable effort to obtain from the individual's
treating physician (or other treating health care provider) all
medical evidence, including diagnostic tests, necessary in order
to properly make [a disability determination], prior to
evaluating medical evidence obtained from any other source on a
consultative basis." 42 U.S.C. § 423(d)(5)(B). The hearing
officer's duty to make "every reasonable effort"[13] does not
require him "to obtain every medical file from every medical
source the claimant has seen," but rather, the hearing officer
"must request additional evidence if the administrative record
does not contain sufficient evidence to make a fair
determination." Ubiles, 2012 WL 2572772, at *10 (citing Perez v.
Chater, 77 F.3d 41, 47-48 (2d Cir. 1996)); see Hilsdorf v. Comm'r
of Soc. Sec., 724 F. Supp. 2d 330, 345 n.7 (E.D.N.Y. 2010).
Further, "the [hearing officer] must not only develop the proof
but carefully weigh it." Hilsdorf, 724 F. Supp. 2d at 344

---

[13] Under the Social Security regulations, "every reasonable
effort" is defined as:

> [A]n initial request for evidence from [the claimant's]
> medical source and, at any time between 10 and 20
> calendar days after the initial request, if the evidence
> has not been received, [the hearing officer] will make
> one followup request to obtain the medical evidence
> necessary to make a determination. The medical source
> will have a minimum of 10 calendar days from the date of
> [the] followup request to reply, unless [the] experience
> with that source indicates that a longer period is
> advisable in a particular case.

20 C.F.R. § 404.1512(d)(1).

(quoting <u>Donato</u> v. <u>Sec'y of the Dep't of Health & Human Servs.</u>, 721 F.2d 414, 419 (2d Cir. 1983)) (internal quotation marks omitted).

The hearing officer is excused from recontacting the source when she knows from past experience that the source either cannot or will not provide the necessary findings. 20 C.F.R. § 404.1512(e)(2);[14] <u>Cross</u> v. <u>Astrue</u>, No. 08-CV-0862 (TJM), 2010 WL 2399379, at *12 (N.D.N.Y. May 24, 2010) (Bianchini, M.J.) (holding that hearing officer met his duty to seek additional information after sending "only one letter requesting information from [a treating source, because] he had evidence before him indicating that she had repeatedly ignored such requests"); <u>Pitcher</u> v. <u>Barnhart</u>, No. 5:06-CV-1395 (LEK/VEB), 2009 WL 890671, at *14 (N.D.N.Y. Mar. 30, 2009) (remanding because although the disability worksheet states that the treating source did not respond to multiple requests, "there are treatment notes in the record from [the treating source], indicating that at some point he did in fact submit records," therefore the court could not establish that the hearing officer knew from past experience that the source would not provide the requested findings). If recontacting the treating source is futile, the hearing officer

_____

[14] This particular provision, 20 C.F.R. section 404.1512(e)(2), is no longer in effect as of March 26, 2012. <u>See</u> 20 C.F.R. § 404.1512. For the disposition of this case, however, this Court will apply 20 C.F.R. section 404.1512(e)(2) as it existed at the time of the hearing officer's decision.

has to state "some reasonable explanation" for failing to fully develop the record.  <u>Ubiles</u>, 2012 WL 2572772, at *8 (quoting <u>Hilsdorf</u>, 724 F. Supp. 2d at 345).

If all reasonable efforts to seek information from the treating source fail and recontacting the source is known to be futile, then the hearing officer has a duty to fill the gaps with consultative examinations and more detailed testimony from the claimant.  <u>See</u> 20 C.F.R. § 404.1512(f) ("[W]hen a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, [the hearing officer] may order a consultative examination while awaiting receipt of medical source evidence.");[15] <u>see also</u> <u>Brandow</u> v. <u>Comm'r of Soc. Sec.</u>, No. 1:05-CV-0917 (NPM/VEB), 2009 WL 2971543, at *5 (N.D.N.Y. Sept. 11, 2009) (McCurn, J.) ("Even if the [hearing officer] believed further requests to [the treating source] would be futile, her duty to develop [the claimant's] record was not satisfied . . . [because the hearing officer] did not fill the evidentiary gaps with . . . a consultative examination."); <u>Moran</u>, 569 F.3d at 114 (holding that where the record is scant and the testimonial record is not properly developed, the hearing officer cannot make a determination of whether the claimant worked in a

_____

[15] This citation reflects the regulations as they were in effect at the time of the hearing officer's decision.  Under the current regulations, this language is found in 20 C.F.R. section 404.1512(e).

substantial gainful activity because a properly developed record "might have supported a claim of the presence of . . . 'special conditions' in these circumstances" (citing 20 C.F.R. §§ 404.1573(c), 416.973(c))).

Additionally, when requesting review of a hearing officer's decision, the claimant may submit new and material evidence for the consideration of the Appeals Council.  20 C.F.R. §§ 416.1470(b), 404.970(b), 404.900(b); see also Sims, 530 U.S. at 111 (citing 20 C.F.R. § 404.970(b)).  This new evidence becomes part of the administrative record.  Perez, 77 F.3d at 46 ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [hearing officer].").

Here, it is undisputed that the Commissioner found Butler disabled with respect to her SSIB application filed on January 26, 2007.  Admin. R. at 48.  The Commissioner determined Butler's disability, which included "[m]uscle, [l]igament [and] [f]ascia disorders," as well as "[o]steoarthritis [and] [a]llied [d]isorders," began on January 1, 2007.  Id. at 48, 97-101; see Butler's Mem. 2; Comm'r's Mem. 1.  The relevant question here, however, is whether Butler was disabled on or before December 31, 1996.  Comm'r's Mem. 5 n.2.

The extent of Butler's medical records available to the hearing officer was limited. Based on the scant record, the hearing officer concluded that Butler was not disabled during the relevant period. Admin. R. at 17. The limited record was due, in part, to the failure of treating sources to provide medical records. Id. The hearing officer noted that despite various attempts to reach out to the sources, the records were not available. Id. at 205, 217, 219. Further, despite being given additional time, Butler's attorney also encountered difficulties obtaining the records from Dr. Cetner because of the physician's recent retirement. See id. at 248. Accordingly, the Commissioner argues that the hearing officer fulfilled his obligation to develop the record. Comm'r's Mem. 7-8 (citing 20 C.F.R. § 404.1512(e)(2)).

Dr. Cetner was initially contacted on May 8, 2007, Admin. R. at 231, and completed the requested questionnaire on May 28, 2007, id. at 207-15, 238 (stating that Dr. Cetner's report was received and is on file). Based on this record, there is no support for the contention that Dr. Cetner was unresponsive. See Pitcher, 2009 WL 890671, at *14. Moreover, the fact that Dr. Cetner retired in May 2009, which allegedly caused Butler difficulties in obtaining the records, does not indicate whether the hearing officer knew from past experience that Dr. Cetner would not furnish the records. See 20 C.F.R. § 404.1512(e)(2).

Therefore, the record does not support the Commissioner's argument that the hearing officer knew from past experience that Dr. Cetner would not provide additional evidence or clarification.

The record does support, however, that the hearing officer knew from past experience that Dr. Cosgrove would not provide additional information. On May 14, 2007, in response to the Commissioner's request for records, Admin. R. at 205, Saratoga Rheumatology returned the forms with a note stating the following: "[N]ever seen here . . . [Butler is] not a patient here," id.; see also id. at 230-31, 238-39. Thus, the hearing officer was not required to recontact Dr. Cosgrove at Saratoga Rheumatology. See 20 C.F.R. § 404.1512(e)(2).[16]

Attempts were made to obtain records from Dr. Greenstein on three different occasions, with respective follow-ups of each contact. Admin. R. at 236, 244. On July 25, 2007, Dr. Greenstein's office responded that he did not keep records for more than ten years, thus any record prior to January 1, 1997, had been destroyed. Id. at 157. At this point the hearing officer need not have sought additional records from Dr. Greenstein because he knew that Dr. Greenstein would not furnish

---

[16] It should be noted, however, that Dr. Cosgrove saw Butler in 2000, Admin. R. at 129, but the hearing officer gave her medical opinion little weight because it is not from the relevant period.

them.  The hearing officer did have access to a partial copy of Dr. Greenstein's February 7, 1996, letter.  Id. at 252.  It is not clear why the hearing officer did not request a complete copy of this letter.[17]  The partial letter omitted significant information, notably Dr. Greenstein's conclusion that Butler met the criteria for fibromyalgia from both an objective and a subjective standpoint.  Id. at 306; cf. Moran, 569 F.3d at 114 ("[I]t was especially important for the [hearing officer] to help [the claimant] develop a testimonial record of the critical events –– even if those events were in the distant past.").

Thus, the hearing officer failed to fully develop the record and improperly relied on the limited medical evidence provided to determine whether Butler was disabled.  See Ubiles, 2012 WL 2572772, at *10 ("The failure to develop the record cannot be harmless error [where the hearing officer] relied on perceived gaps in the medical evidence to find [the claimant] not disabled."); see, e.g., Admin. R. at 15-16 (finding that Butler's subjective complaints, no matter how genuine, cannot be established in the absence of objective medical findings); id. at 17 (determining that although Butler had been diagnosed with fibromyalgia, "the lack of medical evidence . . . [makes it] hard to pinpoint the exact diagnosis or to even evaluate how this

---

[17] As discussed supra, a complete copy of the letter was provided with the new evidence submitted in January 2011.  See id. at 255, 306.

condition impacted on her ability to perform the basic work").
Moreover, in discounting Dr. Elliott's opinion that Butler was
disabled, the hearing officer found that Dr. Elliott's opinion
was not supported by objective examinations that would allow him
to  determine whether the symptoms were of an intensity,
duration, and frequency to preclude Butler from performing her
work.  Id. at 17.

Based on the scant medical evidence, the hearing officer
could not, and in fact did not, make a determination as to
whether the combination of Butler's severe impairments interfered
with her capacities for lifting, carrying, standing, and walking.
See id. at 18; see also Overbaugh v. Astrue, No. 6:07-CV-0261
(NAM/DEP), 2010 WL 1171203, at *9 (N.D.N.Y. Mar. 22, 2010)
(Mordue, C.J.) ("When the record indicates that a plaintiff has
significant limitations with regard to his ability to sit for
extended periods of time, the [hearing officer] should engage in
a detailed discussion concerning plaintiff's restrictions.");
Weiss v. Astrue, No. 1:07-CV-1039 (LEK/VEB), 2009 WL 2843249, at
*5 (N.D.N.Y. Aug. 31, 2009) ("[T]he [hearing officer's] failure
to explain and support her finding with respect to [the
claimant's] ability to sit for prolonged periods cannot be
considered harmless error and is cause for remand."); Barkley v.
Comm'r of Soc. Sec., No. 7:06-CV-730, 2008 WL 2949386, at *12

(N.D.N.Y. July 30, 2008).[18]

Yet the hearing officer discounted Dr. Elliott's opinion as to Butler's capacity to sit, stand, and walk because he was not an acceptable medical source and his opinion was not supported by objective evidence. Admin. R. at 18. On the contrary, "careful consideration" was given to Dr. Cetner's 2007 opinion which stated that Butler had no limitations as to her capacity to sit, stand, and walk. Id.; see id. at 212.

A more developed record would have allowed the hearing officer to evaluate other treating physicians who opined that there was objective evidence of Butler's impairments. For instance, on February 7, 1996, Dr. Greenstein concluded that

_____

[18] As to the necessity to alternate sitting and standing, the Social Security regulations provide:

> In some disability claims, the medical facts lead to an assessment of [residual functional capacity] which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

SSR 83-12, 1983 WL 31253, at *4 (1983).

Butler met the criteria for fibromyalgia from an objective and subjective standpoint. Id. at 306. On July 2, 1991, Dr. Spurgas reported that Butler could not stand, walk, or sit for more than ten minutes due to the pain, which caused her to stop working. Id. at 291. On March 19, 1992, Dr. Byrt reported that Butler suffered from "continuing severe pain, disabling her from most activities," and she could not stand for long time. Id. at 296. On December 22, 1992, Dr. Welch opined that Butler's ability to work would depend on how she can cope with the pain. Id. at 295.

Moreover, a more developed record would have allowed the hearing officer to spot the contradictions in Dr. Cetner's 2007 opinion regarding Butler's limitations. See id. at 211-12 (opining that there are "no objective findings of disability" and that Butler had no limitations as to her capacity to sit, stand, and walk); see also Rosa, 168 F.3d at 79. Dr. Cetner's 2007 opinion contradicts his records from the relevant period.

On August 10, 1991, Dr. Cetner stated that Butler was disabled since March 1991 due to chronic lower back pain, Admin. R. at 268, 271, and that her pain gets "worst at sitting," id. at 264, and he reported in March 1992 that she could not stand or sit for more than ten to fifteen minutes, id. at 263; see id. (noting in November 1992 that Butler was "unable to sit for a length of time"). Therefore, Dr. Cetner's 2007 opinion did "not contain sufficient evidence to make a fair determination."

<u>Ubiles</u>, 2012 WL 2572772, at *10 (citing <u>Perez</u>, 77 F.3d at 47–48).

The hearing officer then found that Butler was not precluded from work because she continued breeding and training dogs until 1994. Admin. R. at 17-18 (noting that Dictionary of Occupational Titles describes this job as requiring lifting, carrying, pushing, pulling twenty to fifty pounds occasionally and ten to twenty-five pounds frequently). The hearing officer failed to explain, however, why he gave no weight to Butler's testimony that her work does not involve any physical activity, which is done entirely by her husband. <u>Id.</u> at 37; <u>see</u> <u>Moran</u>, 569 F.3d at 114 (holding that where the record is scant and the testimonial record is not properly developed, the hearing officer cannot make a determination of whether the claimant worked in a substantial gainful activity because a properly developed record "might have supported a claim of the presence of . . . 'special conditions' in these circumstances" (citing 20 C.F.R. §§ 404.1573(c), 416.973(c))).

Therefore, this Court rules that the hearing officer failed properly to develop the record.[19]

The Appeals Council also erred by not considering the new evidence submitted on January 19, 2011, Admin. R. at 4-5, 175-78, when rendering its decision. <u>See</u> <u>Sims</u>, 530 U.S. at 111. The evidence submitted to the Appeals Council was new and material

---

[19] This Court expresses no opinion concerning whether Butler retained the residual functional capacity to perform her past relevant work.

because the Commissioner's decision to find Butler disabled was based on the evidence submitted for the relevant period and the new evidence demonstrates the existence of objective medical evidence of Butler's impairments <u>before</u> December 31, 1996.  <u>Cf.</u> <u>Lisa</u> v. <u>Sec'y of the Dep't of Health & Human Servs.</u>, 940 F.2d 40, 43-45 (2d Cir. 1991) (holding that reports of four physicians concurring in diagnosis that claimant suffered from fibromyalgia constituted new medical evidence justifying remand to the Secretary of Health and Human Services).

Therefore, this Court concludes that the Appeals Council's failure to consider the new medical evidence submitted on January 19, 2011, warrants remand for reconsideration by the Commissioner.

**V.    CONCLUSION**

Wherefore, for the foregoing reasons, it is hereby

ORDERED that the Commissioner's motion for judgment on the pleadings, ECF No. 13, is DENIED; and it is further

ORDERED that the Commissioner's determination is REVERSED; and it is further

ORDERED that the hearing officer's decision denying disability benefits is REMANDED for further administrative proceedings consistent with this opinion.[20]

**IT IS SO ORDERED.**

---

[20] On remand, the administrative proceedings should be conducted consistent with all current regulations.

**Dated**: February 28, 2013

/s/William G. Young
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE